Ridenour v. Gibson We have Mr. Hunt for the appellate, is that right? Yes, sir. And Mr. Korn, here for the appellate. Mr. Hunt, are you ready to proceed? Yes, sir. I just told her to turn around. She's doing it. Thank you, Judge. My argument is simple. I believe that when a person goes to see an attorney, they're entitled to the best advice that that lawyer has to offer. Plaintiff's lawsuit in Mississippi was dismissed with prejudice after 10 years of riding the docket because his attorney failed to appear for trial. That was in January of 2005. Within a week or two, plaintiff meets with the defendant, Joseph Hofert, to discuss the situation. Defendant refers plaintiff to attorney Morris Chapman for a possible malpractice claim against Mr. Gibson. Here's the rub. The defendant didn't tell plaintiff that there was a fee-sharing agreement between himself and Richard Gibson and that he was just as responsible as Richard Gibson under precarious liability for any potential malpractice on Richard Gibson's part pursuant to Supreme Court Rule 1.5G2. Now, when plaintiff... When you said he referred him, did he have a fee-sharing arrangement with Morris Chapman also? No, sir. So he just told him he does that kind of work and sent him there or gave him as one name he could go to? Well, I believe the testimony was that plaintiff and the plaintiff went to Mr. Hofert's office seeking advice about, hey, my case is dismissed, I've been waiting for 10 years. You sent me to this guy, what do we do now? Now, he came there seeking Mr. Hofert's advice on this particular matter. So when plaintiff seeks Mr. Hofert's advice that his suit's been dismissed in Mississippi, the $64,000 question is whether or not Mr. Hofert's silence as to his own potential liability for any negligence of Richard Gibson amounts to a fraudulent concealment. I believe the answer overwhelmingly is yes, and here's why. What kind of message does it send to the public at large if lawyers do not have a duty to give their very best advice to their clients, irregardless of your own personal interests? Well, Fitch case says that, it says fraudulent concealment, the fraudulent concealment doctrine does not apply since a law firm does not owe a duty to advise a client of its own malpractice. Well, that's true, your honor, if you're my client, I don't have, if I commit malpractice, I do not have an obligation to call you up on the telephone and say, hey, I committed malpractice, you might want to contact another attorney. I don't have to, I have no obligation to do that. But when you come into my office to discuss malpractice, I probably should say, you've got to talk to somebody else. I'm not going to give you any advice on that issue at all. But here... That's not what he did, right? He said, go talk to the chairman. But he didn't tell Mr. Ridenour everything, and that's the rub, that's the silence that DeLuna versus Bersiaga talks about. He didn't tell him, and by the way, when you go to speak to Mr. Chapman, you might want to tell him that there's a fee-sharing arrangement, and that therefore, he can't hide behind that, he just can't. I may not have an obligation to call my client up and say, hey, did you ever claim against me, but when he comes in to discuss with me malpractice, and I seek to give him advice, any advice, I'm on the hook to tell him everything. I've got to give him my best advice. And does the record reflect that Mr. Holford knew that if you have a fee-sharing agreement, that that puts you on the hook? Well, I mean... Did he know it, or he should have known it, I guess, right? He should have known it. I mean, it's a law. It's no different than a person who strikes somebody in the face and says, well, I didn't know that was against the law. He wouldn't have any duty to call up his client and tell him that. He wouldn't have any duty to call up his client. No, but when the client came in to discuss that particular matter with him, he had a duty. He had a duty to give him full advice, tell him everything. Now, in De Luna v. Bursiaga, they make a distinction between... They also talk about the situation of where you're a fiduciary. When you have that fiduciary relationship, that special relationship, you have an obligation to put your client's interests first, not your interests as an attorney. You've got to give him the best advice you possibly can. And I believe that the best advice that he possibly could have given the plaintiff was, hey, you may have a potential claim against Mr. Gibson. I'm referring you to Morris Chapman because he does this kind of work. And furthermore, you might want to tell Mr. Chapman that I had a fiduciary arrangement and that there's a potential claim against me for any good claim that he has against Mr. Gibson as well under that Supreme Court rule. That was his obligation. Because he didn't do that, he concealed that cause of action. De Luna v. Bursiaga makes it real clear that silence, when you ought to speak, is as much a concealment as an active act. I believe there's other case law that says that when you're in that fiduciary relationship... Your client knew that Mr. Holford referred him originally to the fellow down in Mississippi, right? Actually, they're both local attorneys in Illinois. Yes, he knew that Mr. Holford had referred him. There's nothing in the record to show that he knew about the fiduciary arrangement or that he knew about the ramifications of the fiduciary arrangement. When you're in that fiduciary relationship, Your Honor, you place a lot of trust in your attorney or in your physician or whoever because they have special knowledge that you don't have. If Mr. Holford wants to stand on the idea that he didn't know that he was on the hook under that Supreme Court rule, then who would know? If you're going to advise somebody about a particular area of law, then you're at least supposed to know that area of law that you're talking about. I mean, that's the least that a client should be able to expect from you. You know, it comes down to this, as I see it. If you rule in favor of the defendant in this matter, then you're effectively saying a lawyer doesn't have to do his best for a client about a matter if his own interests about that matter are contrary to the client's. And frankly, I think that's just wrong. I mean, there was over 600,000 in medical and the attorney didn't show up. I'm sorry, 600,000 in specialists. I just don't see how the defendant gets around the DeLuna case where they read the person occupying the relationship of fiduciary is under a duty to reveal the facts to the plaintiff and his silence when he ought to speak or his failure to disclose what he ought to disclose is as much a fraud of law as the mere silence. I would note that in his brief, the defendant states that boiled down to its core, plaintiff's argument is simply that he did not know the defendant was a potential tortfeasor in his malpractice claim. Yet it is undisputed the plaintiff knew he had a cause of action for legal malpractice within days of the dismissal of his personal injury action. We're not claiming that defendant Joe Hofer is a potential tortfeasor per se. I mean, he didn't commit the malpractice or the alleged malpractice down in Mississippi, but he is vicariously liable. Yes, plaintiff knew that he had a potential cause of action. He went to talk to Joe Hofer about it. And I keep getting back to this. Once he went to speak to Joe Hofer and Joe Hofer undertook to advise him about the matter and spend time with him and talk to him about it, he can't just say, well, I didn't have to tell him that I was on the hook too. That's inconsistent with the fiduciary relationship. Defendant also writes in their brief, any contrary conclusion would mean that a statute of limitations for legal malpractice claims holds until the defendant lawyer expressly admits that he or she committed malpractice. That's not what we're saying at all, and that goes back to my former argument. I'm not saying that I have to call you up and tell you, hey, I blew it, I committed malpractice. You have some responsibility to do your own research, to watch out for your own interests. My client did that. He went to see Joe Hofer, his trusted attorney. The man that he first went to see about this case ten long years before, now 16 years ago, he went to see him to get his advice. The least he should be able to expect is the best advice the man had to offer, and he didn't receive it. When did he realize that if you refer somebody, you can be on the hook? Pardon? When did your client realize that if a lawyer refers you to somebody else, that that referring lawyer can be on the hook? I pled that my client first learned of that when I learned of it in April of 2008. I then filed the claim within two months. It may be 45 days, but I filed it almost immediately. So Attorney Chapman didn't advise him of that? I don't know what Attorney Chapman found out, because he subsequently passed away. He didn't advise your client of that? No, he did not. Furthermore, there's no showing that Attorney Chapman was ever advised that he even knew about the fee-sharing arrangement. Because, and here's the rub, he would have known, or he would have had a chance to know about the fee-sharing arrangement if Joe Hofer had told the plaintiff in the first place. Wouldn't there be a duty to make that inquiry? I don't know. Well, duty on whose part? On Attorney Chapman's part. Did he malpractice for not making that inquiry? I've never seen a case that says an attorney has a duty to inquire whether the prior attorneys had a fee-sharing arrangement that would put a liability on the, there's no case on that point. I've never seen a case that says an attorney has an obligation to inquire whether there's been a fee-sharing arrangement that would trigger a liability of another attorney. I mean, everybody knows that when you file a suit against one particular attorney, your partners are on the hook, and all Rule 1.5G2 does is incorporate the fee-sharing arrangement. Now, what the cases do say is that if I refer a case to you, and I say, hey, I know you handle family cases, I don't touch them, I'm going to send my client over to you, and we have no arrangement where there's no money that's going to transpose between the two of us, then there's no responsibility on my part. When were you rejected? March or, I'm not sure, March or April of 08. I found out, I found out quick. I asked Richard Gibson if there was a fee-sharing arrangement. It's not in the record. That's how I found out. Well, pardon your theory. It seemed like there may be a duty imposed on attorneys. If you can be held liable for it, you're saying that Holford had a duty to tell his ex-client or his client. Well, I'm not sure that... In favor of requiring that, if you're... Anyway, go on. You've got, on that same point, in the defense brief they've got Carlin v. State Bank. For the fraudulent concealment doctrine to apply, plaintiffs must plead and prove that the fraud actually prevented the discovery of the cause of action. Well, it didn't. It took you ten minutes to figure out the cause of action. You just asked Mr. Gibson. So his conduct didn't prevent you from finding this out. Well, at the time that Morris Chapman represented the plaintiff, Richard Gibson was represented by a law firm under a legal malpractice policy. Morris Chapman would have had no ability to contact Richard Gibson directly. Take his deposition, file an interrogatory. I don't know that he was in the case long enough to do any of that. He was in it for a while. But the point is, after he... And then at some point after Morris Chapman got out of the case, or around that time, it was found out that Mr. Gibson's policy had lapsed. And then it became fair game. And the attorneys within... It took them several months, but they got out of the case. And then... So I was able to talk to him because he's pro se. But there's a big issue about calling somebody up to speak to them when they've told you that they're covered by insurance, possibly vitiating their... What's the cause of action against the estate, Attorney Chapman? Pardon? What's the cause of action? What's the basis of that? The cause of action against the estate of Morris Chapman was that Morris Chapman caused the appeal in Mississippi to be dismissed. Not how he handled any of the... Nothing in Illinois. And that issue has been settled. Let's see. That's all I can think of. Thank you, counsel. Mr. Karn? Thank you. A few points that I'd like to make. I don't want to go into too much detail as to the facts. I think you're aware of the facts. But right after this lawsuit was dismissed in Mississippi, the plaintiff comes to Joe Hoford's office. And at the time of this meeting, the plaintiff blamed Joe Hoford for the dismissal of his cause of action. At his deposition, the plaintiff testified, Question, you were also angry at Mr. Hoford because he's the one that referred you to Rick Gibson. Correct. Question, you thought Mr. Hoford was partially to blame for the dismissal of your lawsuit. Is that fair? Answer, yes, I believe that. So in January of 2005, within days of the dismissal of this lawsuit, the plaintiff knows that his lawsuit has been dismissed. He knows that his lawsuit was dismissed because Richard Gibson failed to appear at trial. And he blames Joe Hoford for that dismissal. In other words, within days of his lawsuit being dismissed, he knew that he had been injured, and he knew that his injury had been wrongfully caused. And that right there triggered the statute of limitations. And the fraudulent concealment doctrine has absolutely no application here. He knew at that point in time that his lawsuit had been dismissed, and he had an obligation under the law to investigate further. What type of investigation do you do? At Mr. Hoford's suggestion, he went to Morris Chapman, and Morris Chapman provided him advice and counsel about what legal options are available to him. And then a legal malpractice case was filed against Richard Gibson in July of 2005. Six months after the dismissal of the Mississippi lawsuit, this lawsuit gets filed. And it wasn't for three and a half years that Joseph Hoford gets banned. Now, the fraudulent concealment doctrine speaks in terms of causes of action. When causes of action are concealed. If a person is liable to an action, fraudulently conceals the cause of action from the knowledge of the person. The action may be commenced at any time within five years after the person discovers that he has a cause of action. Here, there's no dispute that the plaintiff knew he had a cause of action for legal malpractice in January of 2005. He testified in connection with the meeting that he had with my client within days of the dismissal. You knew that you had a potential legal malpractice claim arising out of the dismissal of your Mississippi lawsuit. Answer, yes, sir. And Mr. Hoford was the one who advised you of this fact. Answer, yes, sir. So he knew he had a cause of action for legal malpractice in January of 2005. And the lawsuit was filed in July of 2005. There was no fraudulent concealment. Number two, the second point I'd like to make, and actually let me rewind. The fact that the fraudulent concealment doctrine doesn't apply to the identity of tortfeasors but only applies to causes of action makes complete sense. First, had the legislature intended for it to apply to identity of tortfeasors, the statute could, and I'm quoting the statute, it could very easily say if a person liable to an action fraudulently conceals the cause of action or the identity of the wrongdoer from the knowledge of the person entitled thereto, the action may be commenced. The statute could say that. It doesn't. The statute speaks in terms of causes of action. And the reason it makes sense because, again, under Illinois law, once you know that you've been injured and once you know that your injury was wrongfully caused, you have an obligation to inquire further. The second reason why the fraudulent concealment doctrine doesn't apply here is that the plaintiff knew he had a cause of action well within the limitations period. Within days of the dismissal of his lawsuit in Mississippi, he knew he had a cause of action for legal malpractice. Fair to say, it's 23 months. There's a 24-month statute of limitation. He knew 23 months, 360 days before the statute of limitations expired that he had a cause of action for legal malpractice. In addition, the fraud here, the failure to disclose, and I'm going to talk about that failure to disclose that there was a fee-sharing agreement in a bit, but assuming there was a failure to disclose, it didn't prevent the plaintiff from discovering that he had a cause of action. When the plaintiff went to Morris Chapman's office for the very first time, he said, he told Mr. Chapman, oh, I apologize, you basically told him what had taken place. Question, you told him that Joseph Hofer handled your workers' comp case. Answer, yes, sir. You told him that Joseph Hofer referred you to Rick Gibson. Answer, yes, sir. You told him that Rick Gibson handled your case and didn't appear on the day of the trial. Yes, and that the lawsuit was dismissed. Yes. So the plaintiff told Mr. Chapman that he had been referred to Rick Gibson. Number two, it seems like the entire framework for this argument against Mr. Hofer is based on the contention that Mr. Hofer never disclosed that a fee-sharing agreement, that he had a fee-sharing agreement with Rick Gibson. What I'll submit to you, that fact is nowhere in the record, and it's not cited in the plaintiff's brief. Joseph Hofer wasn't deposed. Denzel Rittenhouse was not asked that specific question at his deposition. And Mr. Chapman, when he was involved in the case, he didn't depose Joe Hofer. And the plaintiff's counsel, Mr. Hunt, didn't depose Joe Hofer. Now, Joe Hofer admitted in the complaint, in his answer to the complaint, that he did have an expectation of receiving a fee agreement in this case. We don't dispute that. But whether or not that fee agreement was actually discussed at a meeting in January of 2005 is nowhere in the record. The additional thing that I'd like to point out as to why the fraudulent concealment doctrine doesn't apply is that nothing that Mr. Hofer did or said or didn't say or didn't do prevented the plaintiff from discovering that he had a cause of action. The last contact they had was in January of 2005, 23 months and 360 days before the statute of limitations expired. Morris Chapman could have filed a suit against Joe Hofer. The plaintiff could have inquired further of Morris Chapman about why a lawsuit wasn't filed. Morris Chapman could have named Joe Hofer as a respondent in discovery. After all, when the lawsuit was first filed, Carlson and Carlson, Richard Gibson's former employer, they were named as respondents in discovery. There's no reason Joe Hofer couldn't have been named as a respondent in discovery. That's the purpose of the respondent in discovery provisions, to determine who potential tortfeasors are. That's one of the purposes, at least. So there was nothing that Joe Hofer did, said, didn't do, or didn't say that prevented Mr. Hofer from being named as a defendant in this case. Plaintiff in Plaintiff's Brief, they talk extensively about the DeLuna decision, and it's an Illinois Supreme Court decision, and it talks about the fiduciary relationship between a lawyer and a client. The one thing that, the one distinguishing factor is that in that case, and the case law supports this, the case law since DeLuna supports this, in that case, in the DeLuna case, the lawyers were prevented from filing their cause of action because of the trust and confidence they placed in their lawyer as a fiduciary. They were in constant contact with their lawyer in that case. How's my medical malpractice case going? It's going really well. The fact of the matter is it wasn't going very well. As you know, in that case, he filed a medical case without a certificate of merit. It got dismissed. He didn't tell his clients. It went up to the Supreme Court. The Supreme Court affirmed. He didn't tell his clients. On three separate occasions, he said, your case is going very well. Your case is going very well. Before they knew it, before they found out the truth, ten years had passed. The trust and confidence they placed in their lawyer as a fiduciary prevented him from discovering they had a cause of action. Here, the trust and confidence that he placed in Mr. Hofer, January of 2005, right after that meeting, there was no more. Then he's in the hands of another lawyer, Morris Chapman, who was more than capable of timely filing a lawsuit against Joseph Hofer. Finally, so for that, I think the DeLuna decision is completely distinguishable. And there's a case, January of 2011, out of the First District, that kind of reiterates some of these points I've made. It is well settled in Illinois law that if a reasonable amount of time remains in the applicable limitations period, when the plaintiff discovers the cause of action, Section 13215 will not extend that period. This is, I'm just going to spell it out for you. It's K-H-E-I-R-K-H-A-H-V-A-S-H. It's an Iranian name based upon the decision. It's 2011, Westlaw 181436. It also has language. What was the last one? 2011, Westlaw what? 181436. It also has language about placing the trust and confidence in the fiduciary as the reason why the cause of action was not filed. Who wrote it? Out of the First District. Justice Gallagher. The last few points that I'd like to make is that when the plaintiff comes to Joseph Hoford's office, and let's assume that Joseph Hoford knows at this time, and you ask the question, did he know at this time that he was on the hook because he had a fee-sharing agreement and Mr. Hunt said it really doesn't matter if he knew or not, but let's assume that he did know that he was on the hook because there was a fee-sharing agreement. I submit to you that Mr. Hoford did exactly what the Illinois rules of professional responsibility say he should have done in that situation. Once he knows that he is potentially responsible for what happened at the trial court level, there's a conflict of interest between a lawyer and a client. A lawyer and a client can't start engaging in extensive discussions and counselings when a conflict of interest develops. The lawyer has an obligation to step back and to refer him to another lawyer and let another lawyer handle the representation from that point forward, and that's exactly what Mr. Hoford did. Number two, there was mention of the Fitch case that specifically holds that a lawyer doesn't have an obligation to disclose to a client that he committed malpractice. And that's, in essence, what the plaintiff's argument is here, is that he did have an obligation to disclose that he committed malpractice, and whether you want to call him a tortfeasor or you want to use terms of vicarious liability, if it's vicarious liability, you're a tortfeasor under the law. I mean, an employer whose employee gets into an auto accident, the employer is as much of a tortfeasor because of vicarious liability as the employee is. In conclusion, I guess, it's our position that the fraudulent concealment doctrine does not apply. Number one, the statute speaks in terms of causes of action. The doctrine does not apply to the identity of tortfeasors, and that's exactly the way the plaintiff wants the statute to be applied here. Number two, the fraudulent concealment doctrine does not apply when the plaintiff knows that he has a cause of action within the limitations period. Here, the plaintiff knew he had a cause of action for legal malpractice 23 months and 360 days before the limitations period expired. You know, one thing that doesn't, it's kind of interesting about the position that the plaintiff is taking here is that it wasn't until he, Mr. Hunt, came in the case and Mr. Hunt realized, hey, there's a fee-sharing agreement. Therefore, Mr. Hofer could be liable for the malpractice. I don't think that the statute of limitations in a legal malpractice case can be, the triggering point can be, can hinge on the choice of the lawyer that he takes and how smart the lawyer is to determine that's the case. Morris Chapman had the case for over, you know, for almost three years and didn't name my client, and let's assume that. That's why I asked, what was his allegations of negligence? Was it for not naming your client? In my opinion, Morris Chapman, it certainly could have been argued that Morris Chapman committed malpractice by not timely naming my client in this case. But if it was another lawyer who comes in and doesn't realize that, then we're still in this polling period. And then a third lawyer comes in and he doesn't know that little nuance in the law, we're still in this polling period. And now we're eight years later and a new lawyer comes in, the fifth lawyer, and all of a sudden he understands the law and says, oh my God, there's a fee sharing agreement. Hofer's on the hook. Then the lawsuit can be timely filed. It just doesn't make sense, especially given the disclosures that Mr. Hofer made in this case. So for that reason, we believe that the court should affirm the Circuit Court of Madison County's summary judgment ruling. Thank you, counsel. Any brief response? Well, I want to point out one little error. I believe Mr. Chapman began representing the plaintiff in 1995, and he did not represent him for three years because I believe in late in 1996 he had already passed away. And he got out of the case early in 1996. So he had the case approximately a year, give or take, maybe less. Now, I can't get away from the fact that regardless of whether he's angry or not, the plaintiff still went to the defendant, Joseph Hofer, for advice. He still had an expectation of receiving the best advice possible, and Joseph Hofer undertook to give him that advice. Now, there's some dicta in the Luna v. Bersiagas, and it's on page 7. Let's see. 223 Illinois 2nd, 49, I believe. The practice of law is a public trust. And, I mean, it just basically cites the Illinois Rules of Professional Conduct preamble. The practice of law is a public trust. Lawyers are the trustees of the system by which citizens resolve disputes. The attorney-client relationship constitutes a fiduciary relationship. Those who utilize legal services place a great deal of trust in their attorney. The attorney-client relationship presents a significant potential for abuse. Now, whether the plaintiff is mad because he had a bad situation, right or wrong, whether he's had a good case or a bad case, he can still be angry. But that's not the test. The test is he went to speak to Joseph Hofer to get the best legal advice that Mr. Hofer had to give, and he didn't receive it. And it just strikes me as odd that the one little piece of information that Mr. Hofer withheld that was silent about, that Bersiaga talks about, is that little piece of advice that just happens to be the part where he's on the hook. Now, in law school, there was a little phrase in contracts, if you're going to write at all, write it all. So I would say that if you're going to advise a client, give him all the advice. Don't hold it back. Something counsel said, he said that nothing prevented the discovery of the cause of action. Here we have a situation. In the real world, the situation is Mr. Hofer is advising the plaintiff about malpractice. He's got an obligation as the fiduciary to give him the best advice possible. You have a chance as the judges in the Fifth District to say, we're not going to have this little Fox and Harris game where it's catch me if you can. I don't have to tell you everything. And you've got to find some things out on your own. Well, that may be fine, except when you're actually giving that advice yourself as the attorney to your client. The client shouldn't have to go ferreting out information that just happened to get left out by the attorney. Now, counsel also made a statement that the plaintiff had an obligation to watch out for his own interests, basically. And I think the plaintiff did exactly that. I forget the exact time. I said within two weeks. But counsel mentioned that it was within five days. The plaintiff is back in Mr. Hofer's office. Hey, what's up? I think that's pretty diligent. He went back after 10 years to the lawyer that he trusted. Your Honor, your honors, I believe that the plaintiff had a right to better what he got. I believe that. Thank you. Thank you, gentlemen, for your briefs and arguments. We'll take manual advisement and get back to you in court.